IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.H. STEVEDORING CO.<br>and<br>PENN WAREHOUSING AND<br>DISTRIBUTION, INC.,<br><br>              Plaintiffs<br><br>v.<br><br>FASIG-TIPTON COMPANY, INC.<br>and<br>FASIG-TIPTON MIDLANTIC, INC.,<br><br>              Defendants. | CIVIL ACTION<br>No. 02-CV-4040 |

**DEFENDANTS', FASIG-TIPTON COMPANY, INC. AND FASIG-TIPTON MIDLANTIC, INC.'S, SUR REPLY TO THE RESPONSE OF PLAINTIFFS, J.H. STEVEDORING CO. AND PENN WAREHOUSING AND DISTRIBUTION, INC., TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, Fasig-Tipton Company, Inc. ("FTC") and Fasig-Tipton Midlantic, Inc. ("FTM")[1], by and through their attorneys, Cozen O'Connor, hereby file this Sur Reply to the "Response of Plaintiffs, J.H. Stevedoring Co. ("J.H.") and Penn Warehousing and Distribution, Inc. ("Penn")[2] to the Motion For Summary Judgment of Defendants' Fasig-Tipton Company, Inc. and Fasig-Tipton Midlantic. Inc." (**"Plaintiffs' Response"**).

I.   PROCEDURAL HISTORY

On or about June 24, 2002, the Plaintiffs filed their Complaint against Fasig-Tipton Company, Inc. and Fasig-Tipton Midlantic, Inc. The Complaint alleges three causes of action: (1) Conversion; (2) Unjust Enrichment; and (3) Negligence. On or about April 1, 2003, the Defendants filed their Motion for Summary Judgment against the Plaintiffs. On or about April 14, 2003, the

---

[1] FTC and FTM may hereinafter be collectively referred to as the **"Defendants."**
[2] J.H. and Penn may hereinafter be collectively referred to as the **"Plaintiffs."**

Plaintiffs filed their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

II.     ARGUMENT

Upon review of the Plaintiffs' Response, it is interesting to point out that a certain theme permeates the Plaintiffs' brief. Simply stated, the Plaintiffs fail to acknowledge that the embezzlement by Dennis Bishop (**"Bishop"**), and the initiation of this litigation for that matter, would not have occurred but for the Plaintiffs' own acts and/or failure to act. Instead, the Plaintiffs elect to focus their energies on the alleged wrongful acts of others as opposed to their own. In doing so, the Plaintiffs have asserted certain points and positions that are simply not true.

    **A.    The Plaintiffs' Own Acts, Errors, Omissions And Other Conduct Allowed The Embezzlement To Occur**

It is well documented that the Plaintiffs did not follow their own accounting policies and procedures which required that all checks have supporting documentation before they were signed. In a two year period, the Plaintiffs signed approximately twenty-five (25) fraudulent checks for Bishop, twenty-one (21) of which were manual checks without supporting documentation. Indeed, David Warner (**"Warner"**) of Zelnick, Mann & Winikur, P.C. (**"Zelnick"**) stated that the checks would not have been issued if the Browns had required documentation and/or supporting invoices for each check that they signed.[3]

Furthermore, the Plaintiffs fail to acknowledge that they did not perform the proper bank reconciliations. By allowing Bishop, the same individual who reviewed and approved invoices and issued checks, to perform bank reconciliations, the Plaintiffs and/or Zelnick eliminated an important

---

[3] **See Exhibit "A"**, Warner Dep. at 82:14-19. Christopher Gehricke (**"Gehricke"**), Controller for Penn Warehousing and Distribution, Inc., additionally believed that if the Browns had required documentation and/or invoices, Bishop would not have been able to have the fraudulent checks signed. **See Exhibit "B"**, Gehricke Dep. at 95:4-15.

procedure that would have protected them from his dishonesty.[4] John Brown, Jr. and Terrence Brown have admitted that if proper bank reconciliations had been performed Bishop would not have been able to embezzle $1,170,286.00 from the Plaintiffs.[5] It is obvious that the Plaintiffs cannot come to grips with the fact that they allowed a trusted employee and friend to take advantage of them for as long as they did.

   B. **Defendants Consistently Conducted Their Business In Accordance With Common Industry Practice**

  Failing to acknowledge their own business inadequacies in the Plaintiffs' Response, the Plaintiffs instead elect to mischaracterize the business practices of the Defendants. First, the Plaintiffs allege that the Defendants have no specific guidelines for the extension of credit to customers. On the contrary, after credit has been established and a repeat customer purchases horses on a consistent basis while paying invoices on time, the Defendants' policies and procedures dictate that there is no need to update that customer's original credit application.[6]

  Secondly, the Plaintiffs attempt to fashion the deposition testimony of Donald Butte ("**Butte**") to propound the notion that the Defendants should have been concerned and approached Bishop when he attempted to increase the size of his transactions and purchase horses in excess of $100,000. This is not the case. In fact, Butte testified that he was only referring to a customer who normally purchased in the $5,000 range and all of a sudden made a jump to the $100,000 range.[7]

---

[4] Warner, who was supposed to perform bank reconciliations, but did not, testified that if he had performed this duty, as contemplated by the Plaintiffs, he would have notice the discrepancies. **See** **Exhibit "A"**, Warner Deposition at 233:17-21.
[5] **See Exhibit "C"**, John Brown, Jr. Dep. at 86:3-12; Terrence Brown Dep. at 92:18-93:4.
[6] **See Exhibit "D"**, Expert Report of Harvie B. Wilkinson ("**Wilkinson Report**") at ¶ 9 (stating that there is no need to periodically update credit checks of long-standing customers with impeccable payment histories).
[7] **See Exhibit "E"**, Butte Dep. at 70:21-25 through 72:16.

3

Since the Defendants considered Bishop a wonderful customer with an excellent payment history, no concerns were raised when Bishop wanted to purchase horses for over $100,000.[8]

Finally, the Plaintiffs allege that the Defendants do not have policies or procedures to manage the receipt of third party checks, to identify potential problems with checks or to avoid fraud.[9] Quite the opposite, the Defendants' handling and receipt of checks is commercially reasonable as prescribed by industry standard.[10]

C.   **Statute Of Limitations**

The Plaintiffs have cited to Tohan v. Owens-Corning Fiberglass Corp., 696 A.2d 1195, 1200 n.4 (Pa. Super 1997), in support of the position that for statute of limitations purposes, the point at which the complaining party should reasonably be aware of his injury is generally a question of fact to be determined by the jury. However, the Pennsylvania courts have held that "where the facts are so clear that reasonable minds cannot differ as to whether the plaintiff should reasonably be aware that he has suffered an injury, the determination as to when the limitations period commences may be made as a matter of law." Kingston Coal Co. v. Felton Mining Co., Inc., 690 A.2d 284, 288 (Pa. Super. 1997).[11] Certainly, Bishop's embezzlement was the sort of injury which, in the exercise of reasonable diligence, could and should have been discovered within the statutory period.

---

[8] See **Exhibit "D"**, Wilkinson Report at ¶ 5 (stating it is commonplace for customers to begin purchasing horses at the lower end and to gradually progress to higher quality and more expensive horses).

[9] Citing the expert report of Charles M. Steele, the Plaintiffs contend that certain caution flags should have caused the Defendants to investigate the checks used by Bishop. It is imperative to point out that while Mr. Steele has an extensive background in world of banking, the Plaintiffs rely upon an expert who has no experience whatsoever in retail, or the horsing industry and its practices for that matter.

[10] See **Exhibit "D"**, Wilkinson Report, ¶¶ 2-4 (stating that: (i) it is commonplace to accept payment of horses through the use of third party checks; (ii) it is not standard operating procedure to question the source of a third party check especially when delivered by an existing customer; and (iii) it is commonplace to receive checks from multiple sources for the payment of one invoice).

[11] In Kingston Coal, the court held that the plaintiff's action for conversion and unjust enrichment was barred by the statute of limitations and summary judgment was granted in favor of the defendants. According to the court, "[w]hen information is available, the failure of the plaintiff to make the proper inquiries is failure to exercise reasonable diligence as a matter of law." Kingston Coal, 690 A.2d at 289.

Therefore, it is respectfully submitted that this Court may make a statute of limitations determination in the instant case as a matter of law.

### D. Plaintiffs Had Reasonable Opportunity To Learn Of Bishop's Embezzlement

The Plaintiffs argue that the Defendants' status as a holder in due course may be defeated if there was "fraud that induced the obligor to sign the instrument without knowing its terms and without reasonable opportunity to find them out." 13 Pa. Cons. Stat. Ann. § 3305(a)(1)(iii). However, the notes to Section 3305(a)(1)(iii) specifically state that the obligor must have had no reasonable opportunity to obtain knowledge of the fraud.[12] It is not disputed that the Plaintiffs had multiple opportunities to investigate and learn of Bishop's embezzlement if they merely followed their own policies concerning the signing of checks, and could have, through their own efforts, easily avoided all or substantially all of their alleged losses.[13] Therefore, the defense of § 3305 is inapplicable in the instant case.[14]

### E. Plaintiffs Have Not Acted Reasonably In Mitigating Their Damages

Finally, the Plaintiffs cannot be allowed to continue with a damages claim that is unreasonable and speculative. They have offered no evidence to support their contention that they acted fairly and reasonably when selling the horses Bishop purchased with embezzled checks. By

---

[12] The Notes to Section 3305(a)(1)(iii) provide in pertinent part: "The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account including the intelligence, education, business experience, and ability to read or understand English of the signer."

[13] Indeed, the Plaintiffs have admitted that they did not properly supervise and monitor Bishop. **See Exhibit "C"**, John Brown, Jr. Dep. at 158:23-159:18

[14] The Plaintiffs additionally argue in footnote 8 of Plaintiffs' Response that 13 Pa. Cons. Stat. Ann. § 3304 may be applicable for comparative negligence reasons. Section 3404 deals specifically with imposters and fictitious payees. In the present case, Bishop did not use an imposter or fictitious payee with respect to the checks in question. The checks were signed by a duly authorized agent of the Plaintiffs and they were made payable to the Defendant, not a fictitious payee. Therefore, § 3404 is not relevant to the present case and its comparative negligence standard should not apply.

their own admission, the Plaintiffs have lost considerable sums of money on the resale of some horses.[15]

Further, by pointing out the Plaintiffs' settlement figures with Zelnick and Fidelity and Deposit Company of Maryland (**"Fidelity"**), the Defendants are not attempting to take advantage of the existence of collateral remedies already achieved.  Instead, the Defendants believe it is important for this Court to recognize that if the Plaintiffs are allowed to continue with these unreasonable damages claims, they are in fact seeking the recovery of an amount greater than that embezzled by Bishop and will be unjustly enriched.[16]

### III.   CONCLUSION

For the reasons set forth herein, Defendants, Fasig-Tipton Company, Inc. and Fasig-Tipton Midlantic, Inc., respectfully request that this Honorable Court grant its Motion for Summary Judgment against Plaintiffs, J.H. Stevedoring Co. and Penn Warehousing and Distribution, Inc.

Respectfully submitted,

**COZEN O'CONNOR**


BY:_____
F. WARREN JACOBY, ESQUIRE
GLENN W. REIMANN, ESQUIRE
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

Attorneys for Defendants, Fasig-Tipton
Company, Inc. and
Fasig-Tipton Midlantic, Inc.

Dated:  May 9, 2003

---

[15] **See Exhibit "F"**.  The Resale Information chart was provided as an exhibit in the Plaintiffs' Response.  More importantly, this was the first time the Plaintiffs have provided such information to the Defendants.  As evidenced by the chart, Hip #481 was originally purchased for $71,000, but resold for $7,500 (difference of $63,500).  Hip # 85 was originally purchased for $25,000, but resold for $7,200 (difference of $17,800).  Hip #341 was originally purchased for $11,000, but resold for $5,000 (difference of $6,000).  Hip #434 was originally purchased for $3,200, but resold for $3,000 (difference of $200).  The total difference alone equals $87,500.

[16] The Plaintiffs have recovered $986,150.96 of the $1,170,286.00 embezzled by Bishop.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing "Defendants', Fasig-Tipton Company, Inc. and Fasig-Tipton Midlantic, Inc.'s, Sur Reply to the Response of Plaintiffs, J.H. Stevedoring Co. and Penn Warehousing and Distribution, Inc., to the Defendants' Motion for Summary Judgment" in the above-captioned matter was served upon the following-named person on the 9th day of May, 2003, by first class mail:

> Michael S. Hino, Esquire
> Pepper Hamilton LLP
> 1235 Westlakes Drive
> Suite 400
> Berwyn, PA  19312

**COZEN O'CONNOR**

BY:_____
F. WARREN JACOBY, ESQUIRE
GLENN W. REIMANN, ESQUIRE
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

Attorneys for Defendants, Fasig-Tipton Company, Inc. and Fasig-Tipton Midlantic, Inc.